**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ovie L. DUNCAN, Defendant–Appellant.**

**No. 87–2618.**

United States Court of Appeals,
Tenth Circuit.

March 21, 1989.

David J. Phillips (Charles D. Anderson, Federal Public Defender, with him on the brief), Asst. Federal Public Defender, D. Kansas, Kansas City, Kan., for defendant-appellant.

Julie A. Robinson (Benjamin L. Burgess, Jr., U.S. Atty., D. Kansas, with her on the brief), Asst. U.S. Atty., Kansas City, Kan., for plaintiff-appellee.

Before McKAY, McWILLIAMS and TACHA, Circuit Judges.

TACHA, Circuit Judge.

This appeal is from an order of restitution entered by the district court following the defendant's guilty plea on one count of a fourteen-count indictment. The defendant, Ovie Duncan, claims on appeal that the district court erred in ordering restitution for the victim's losses associated with thirteen counts of the indictment for which he did not plead guilty. We affirm.

Duncan and his family lived in the same neighborhood as Mr. Zollie Monroe, an elderly man who was nearly blind. When the Duncans were to be evicted from their home, Monroe invited them to move in with him. Duncan apparently agreed to assist Monroe in paying bills and performing household chores as part of this living arrangement. This case arose out of Duncan's actions that allegedly took advantage of his relationship with Monroe and access to Monroe's funds.

A grand jury returned a fourteen-count indictment against Duncan in connection with his wrongful actions against Monroe. The first thirteen counts charged him with forging Monroe's endorsement on the back of checks drawn upon the United States Treasury, in violation of 18 U.S.C. § 510(a)(1). Count fourteen charged him with violating 18 U.S.C. § 1341 through devising a scheme to defraud Colonial Penn Life Insurance Company by submitting an application for life insurance through the mails that falsely represented Zollie Monroe as the applicant and falsely represented himself as Monroe's stepson, naming himself as beneficiary.

Pursuant to plea negotiations with the Government, Duncan agreed to plead guilty to count fourteen, and the Government agreed to dismiss the other thirteen counts after sentencing. The Government further agreed not to make any recommendations regarding Duncan's sentence, but the plea agreement otherwise did not cover the subject of restitution.

At Duncan's arraignment, the district court heard the Government's summary of evidence that would be presented if the case went to trial. This evidence included a description of the living arrangement, and the following additional information:

[T]he defendant, while in possession of about $600 a month from two government checks that Zollie Monroe received, failed to pay all the household bills, failed to buy groceries and to otherwise take care of Zollie Monroe as agreed.

Zollie Monroe for years had a life insurance policy with the Old American Life Insurance Company. Mr. Monroe's sister was the beneficiary of that policy. The defendant failed to pay the premiums on this policy as Zollie Monroe had instructed him to and the policy lapsed.

On September 14, 1986, the defendant sent through the U.S. mail a life insurance application to Colonial Penn Life Insurance Company in Philadelphia. The life insurance application contained false statements and was made on a false pretense, that being that the applicant was Zollie Monroe, when, in fact, the applicant was the defendant, who made the application in Zollie Monroe's name without Monroe's knowledge or authorization.

There was also a false statement in the application that the defendant was Zollie Monroe's stepson when, in fact, there was no familial relationship by blood or marriage. The application also made the defendant Zollie Monroe's beneficiary of this policy.

Duncan's counsel agreed to all of the material facts relating to the mail fraud, but he disputed some of the facts regarding the use of Monroe's funds from government checks. He conceded that some of Monroe's bills were left unpaid, but denied that Duncan had failed to buy groceries or failed to feed Monroe. The district judge accepted Duncan's guilty plea to the mail fraud charge in count fourteen of the indictment, but did not mention the possibility of restitution for any of the offenses charged in the indictment.

At the sentencing hearing, the court questioned Duncan about facts contained in the presentence investigation report that were related to counts one through thirteen of the indictment. Duncan's counsel disputed the amount of loss associated with counts one through thirteen, contending that at one time Duncan had permission to cash Monroe's checks. He contended that the Government could show neither when Duncan began cashing checks without permission nor how much of the proceeds was not spent for the care and support of Monroe. Although conceding that a portion of the proceeds from the forged government checks may not have been used for the benefit of Zollie Monroe, he denied that Duncan had taken the entire amount of the checks for his own benefit. Duncan's counsel noted that "there is a civil suit that is pending, that is filed, and it will raise all of these matters [relating to the amount of loss associated with Duncan's alleged forgery of government checks]."

The district court found by a preponderance of evidence from the arraignment and sentencing proceedings, including the presentence report, that Zollie Monroe was a victim pursuant to 18 U.S.C. §§ 3663, 3364, who had sustained losses as a result of Duncan's criminal actions. With regard to count fourteen, to which Duncan pleaded guilty, the court found that Monroe had sustained a loss of $273, representing the cost of reinstating Monroe's lapsed life insurance policy. With regard to counts one through thirteen, the court found that Monroe had sustained a loss totaling $4,186, representing the total amount of the thirteen forged checks.

The court ordered Duncan to pay restitution in the total amount of $4,459, "or such lesser amount as shall be determined in the civil lawsuit now pending in the Wyandotte County District Court." The court restated its order as follows:

In other words, after a civil trial of this matter, if a lesser amount on these two specific items, the Veterans Administration checks and also the $273.00 that was involved in getting the insurance reinstated, if it's determined from those proceedings that a lesser amount is due on those two items, then that shall be the amount of restitution and this amount, whatever the final amount is, is to be paid to Zollie Monroe, the victim.

Duncan contends on appeal that the district court erred in two respects in ordering restitution for losses associated with counts one through thirteen of the indictment. First, he claims that the forgery activities charged in counts one through thirteen are unrelated to the mail fraud count to which he pleaded guilty, and that they therefore do not constitute part of the "offense" for which restitution can be

awarded under pertinent provisions of the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. §§ 3663, 3664. Second, he claims that the Government failed to prove such losses by a preponderance of the evidence as required by 18 U.S.C. § 3364(d).

## I.

Duncan's first claim involves the validity of the restitution order under the VWPA. An order of restitution under the VWPA is part of the sentencing process. *United States v. Richard*, 738 F.2d 1120, 1122 (10th Cir.1984). We review the legality of a sentence *de novo*. *United States v. Angelica*, 859 F.2d 1390, 1392 (9th Cir. 1988). Sentencing that falls within the statutory limits, however, is reviewed only for an abuse of discretion. *United States v. Pomazi*, 851 F.2d 244, 247 (9th Cir.1988); *see Richard*, 738 F.2d at 1122.

The VWPA provides in relevant part: "The court, when sentencing a defendant convicted of an offense under [Title 18] ... may order, in addition to or, in the case of a misdemeanor, in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a). Restitution may be ordered for "the amount of the loss sustained by any victim as a result of the offense." *Id.* § 3664(a).

Duncan's claim in this case, that he cannot be ordered to make restitution for criminal acts for which he did not plead guilty, turns on the meaning of the term "offense" as used in the VWPA.

## A.

The VWPA does not explicitly define the term "offense." We therefore must look to the intent of Congress as contained in the language and purposes of the Act to determine the meaning of this term. Congress enacted the restitutory provisions of the VWPA for the purpose of compensating victims of crimes: "[t]he legislative history of the VWPA indicates that Congress intended to enact a victim compensation scheme 'to restore the victim to his or her prior state of well-being' to the highest degree possible." *United States v. Hill*, 798 F.2d 402, 405 (10th Cir.1986) (quoting

S.Rep. No. 532, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S.Code Cong. & Admin.News 2515, 2536).

This court relied on the compensatory purpose behind the VWPA in rejecting a restrictive interpretation of the term "offense" that would exclude losses caused by criminal acts which were not alleged in the indictment and for which the defendant was not convicted:

[I]n determining the amount of loss to a victim for purposes of awarding restitution under the VWPA, a district court is not limited either by the amount specified in the indictment or the specific transactions alleged in the indictment. Taking into consideration the evidence adduced at trial and the evidence presented in the sentencing phase of the case, a district court may order a defendant to pay restitution to any victim for the amount of loss sustained "as a result of the offense," [18 U.S.C. § 3664(a)], so long as this amount is supported by a preponderance of the evidence.

*Hill*, 798 F.2d at 406. The defendant in *Hill* was indicted and convicted on two counts of transporting stolen goods in interstate commerce. Although the indictment alleged that the stolen goods had an approximate value of $20,000, the district court ordered restitution of $148,330. The court based its decision upon statements of the defendant's counsel at sentencing that the loss to the victim shown at trial was $153,000, and testimony at trial indicating both that the losses arose from transactions similar to the offenses listed in the indictment and that the defendant was responsible for those losses. *Id.* at 404, 406.

The Ninth Circuit followed *Hill* in holding that when a defendant pleads guilty to an offense involving a continuing scheme to defraud, restitution is not restricted to the specific victims or amounts listed in the indictment, *United States v. Pomazi*, 851 F.2d at 248–50. "[I]n cases which involve a continuing scheme to defraud, 'it is within the power of the court to require restitution of any amount up to the entire illicit gain from such a scheme, even if only some specific incidents are the basis

of the guilty plea.' " *Id.* at 249–50 (quoting *United States v. Davies,* 683 F.2d 1052, 1055 (7th Cir.1982)).

> [W]hen the crime charged involves a scheme to defraud, a sentencing court may order restitution paid to victims of the entire scheme even though all of them are not named in the indictment or information. The amount of restitution, however, must be definite and limited by the amount actually lost by the victims. The court must be able positively to identify each victim to whom restitution is due and, in addition, the defendant must be given the opportunity to refute the amount ordered. Finally, the amount of restitution ordered must be judicially established.

*Id.* at 250 (citations omitted).

*Hill* and *Pomazi* demonstrate that the VWPA does not restrict a sentencing judge to considering only those acts for which conviction was had, or for which the defendant pleaded guilty. The judge ordering restitution under the VWPA is free to look beyond the indictment to other acts committed by the defendant that caused a loss to the victim. Although the sentencing judge here did not look beyond the indictment, as the restitution order considered only criminal acts listed within the indictment, the rule of *Hill* and *Pomazi* nevertheless applies. If "offense" is not restricted to the specific acts for which conviction was had or for which the defendant pleaded guilty, the fact that such acts are contained in the indictment and the defendant did not plead guilty to them does not automatically preclude them from becoming the basis of restitution.

### B.

Although "offense" cannot be restricted to the elements of the crime for which the defendant has pleaded guilty, or for which guilt was proved at trial beyond a reasonable doubt, both *Hill* and *Pomazi* implicitly recognize some limit upon the scope of the activities that may be considered part of the "offense." *Hill* involved a series of similar criminal acts of theft that caused the same kind of financial loss to the victim. *Hill,* 798 F.2d at 404, 406. *Pomazi* involved a mail fraud scheme in which only

two victims were named in the indictment, but which ultimately caused losses to several identifiable victims not named in the indictment. *Pomazi,* 851 F.2d at 246–47. Both cases involved restitution orders for actions that were related to the offense for which a guilty plea was entered.

Although the precise contours of the scope of "offense" under the VWPA must be determined under the facts of each case, we interpret the VWPA to permit an order of restitution for losses incurred by the victim as a consequence of the defendant's criminal acts other than those for which a guilty plea was entered, when there is a significant connection between those other criminal acts and the crime for which a guilty plea was entered.

The Sixth Circuit's decision in *United States v. Mounts,* 793 F.2d 125 (6th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986), provides support for this conclusion. In *Mounts,* the defendant used explosives that he had stolen from a nearby mine in an attempt to blow up a safe, causing significant damage to the victim's business property. *Id.* at 126. The defendant also stole some of the victim's business equipment and stole a Corvette from the victim to escape the scene of the crime. *Id.* The Corvette was subsequently damaged in a collision with a pickup truck owned by a third party. *Id.*

The defendant in *Mounts* was indicted on five separate counts arising out of these transactions. The first four counts charged offenses relating to the *use* of explosives, and the fifth count charged the offense of being a convicted felon *receiving* explosives transported in interstate commerce. *Id.* The defendant pleaded guilty to the fifth count only, and the Government dismissed the first four counts. *Id.* at 126–27. The district court awarded restitution to the victim based upon the loss of its business equipment and losses related to the stolen Corvette. *Id.* at 127. The defendant appealed this order on the ground that "the trial judge erred in ordering restitution for losses which were not directly caused by the conduct for which the defendant pleaded guilty." *Id.*

The Sixth Circuit upheld the district court's award of restitution for the stolen business equipment and Corvette despite the fact that neither loss involved the material elements of the crime for which the defendant pleaded guilty. *Id.; see* 18 U.S.C. § 842(i)(1) (making criminal the *receipt* of explosives by convicted felon).[1]

The burglary, misuse of dynamite in blowing up the safe, and theft of the Corvette for purposes of escape were an *uninterrupted series of events surrounding the criminal activity* of [the defendant]. Stealing a car to escape the scene of a misuse of explosives unlawfully received is not so attenuated as to elude the definition of *Durham, i.e.,* "a 'victim' [is] a person who suffered injury as a result of the defendant's actions that *surrounded the commission of the offense, regardless of whether the actions are elements of the offense charged.*"

*Mounts,* 793 F.2d at 128 (emphasis added) (quoting *United States v. Durham,* 755 F.2d 511, 513 (6th Cir.1985)). The court stated that this result comports with the "remedial purposes" of the VWPA: "Perpetrators of crime should bear the full consequences of their criminal acts to the extent that this is possible. Neither innocent victims nor society should bear any of the resultant costs." *Id.*

Although the Sixth Circuit purports to apply a restricted definition of "offense,"[2] we believe that the result in *Mounts* regarding restitution for damage to the stolen Corvette and for losses attributable to

stolen business property is consistent with the definition of "offense" applied in *Hill* and *Pomazi*. This result demonstrates that the VWPA does not prohibit an award of restitution based upon criminal activity that does not encompass the elements of the crime for which a defendant pleaded guilty, if there is a sufficient connection between such crimes.

We therefore hold that when there is evidence that the defendant committed other criminal acts that had a significant connection to the act for which conviction was had or for which a guilty plea was entered, a sentencing judge may order restitution for losses resulting from such acts if the Government can prove both that the defendant caused such losses, and the amount of such losses, by a preponderance of the evidence.

## C.

The victim in this case, Zollie Monroe, an elderly man whose blindness made him dependent upon Duncan for the payment of his bills and for his care, sustained financial loss through Duncan's fraudulent activity. Whether forging Monroe's endorsement on government checks with the intent to defraud him of the proceeds, or forging Monroe's signature upon a life insurance policy with the intent to make himself the beneficiary, both of these criminal acts occurred because Duncan took advantage of Monroe's dependent situation. We see no significant difference in the fact

---

**1.** The court also sustained an award of damages resulting from the use of the explosives. The legislative history of the statute defining the defendant's offense, 18 U.S.C. § 842(i)(1), indicated that Congress intended to protect persons from the misuse of such explosives. *United States v. Mounts,* 793 F.2d 125, 128 (6th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). Apparently, because the victim was among the contemplated class of victims of the misuse of dynamite, it was a "victim" for purposes of the VWPA entitled to compensation for losses connected with the use of explosives, despite the fact that the use of the explosives was not an element of the offense for which the defendant pleaded guilty.

**2.** The Sixth Circuit has stated that "offense" is defined narrowly to include only the offense for

which the defendant was convicted. *Mounts,* 793 F.2d at 127; *United States v. Durham,* 755 F.2d 511, 512 (6th Cir.1985). "Victim," on the other hand, is defined broadly to include any "person who suffered injury as a result of the defendant's actions that surrounded the commission of the offense, regardless of whether the actions are elements of the offense charged." *Mounts,* 793 F.2d at 127 (quoting *Durham,* 755 F.2d at 513). We believe that the narrow definition of "offense" is effectively obliterated through applying the broad definition of victim, as the injury caused by "acts surrounding the offense" clearly contemplates acts other than the elements of the crime for which the defendant was convicted. We decline to follow the Sixth Circuit to the extent of its purported narrow definition of "offense."

that the count for which Duncan pleaded guilty involved the use of the mails, while his forgery of Monroe's endorsement on government checks did not. All of these acts were part of an ongoing scheme to defraud Monroe.

We therefore find that a significant connection is present here to permit the sentencing judge to consider the forgery losses as part of the restitution that could be imposed upon Duncan. The district court did not err in ordering that Duncan's acts of forgery could be considered in determining the amount of restitution to be awarded as part of Duncan's sentence in connection with his guilty plea for mail fraud.

## II.

Duncan further claims that the district court erred in ordering restitution because the Government failed to prove by a preponderance of the evidence that restitution is appropriate, as required by 18 U.S.C. § 3664(d). Section 3664(d) provides in relevant part:

> Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government.

18 U.S.C. § 3664(d).

To the extent that Duncan seeks to require that the Government prove by a preponderance of the evidence that the losses from the forged government checks were directly caused by his act of mail fraud, to which he pleaded guilty, his argument merely restates the claim we rejected above. As discussed in part I, the VWPA does not restrict the court's consideration to only those losses directly caused by the elements of the crime to which the defendant pleads guilty.

Duncan's argument may also be construed, however, as challenging the sufficiency of evidence underlying the district court's order of restitution. Duncan claims that "[a]ny factual determinations made by the trial court were based upon the presentence report or oral statements of the Government." He invokes our decision in

*United States v. Watchman*, 749 F.2d 616 (10th Cir.1984), contending that the record in this case, outside of the presentence report and unproved allegations of the Government, does not adequately support the district court's order of restitution. This argument misunderstands the nature of the district court's order and ignores the statements of Duncan's counsel on the record at arraignment and sentencing proceedings.

According to the Government's summary of evidence presented at Duncan's arraignment, although Duncan was in possession of about $600 per month from government checks that Zollie Monroe had received, Monroe's bills were left unpaid. Duncan did not dispute his possession of Monroe's funds from government checks, and his counsel conceded that some of Monroe's bills were left unpaid.

At the sentencing hearing, the judge questioned Duncan's counsel regarding the Government's version of the facts contained in the presentence report. The Government had alleged that Duncan had failed to inform Monroe that his government check was increased from $60 to $324, and that Duncan spent the money for purposes other than Monroe's benefit. The sentencing judge asked whether Duncan contended that he had spent all of the proceeds on Monroe. Duncan's counsel responded that "a large portion of that [amount]" was spent on Monroe, and noted that the Government's version of the facts was in dispute. "[P]erhaps some of what they say is true but certainly not the entire amount, and that is what the problem is." Duncan's counsel noted that there was "evidence on both sides" and that the "real truth" regarding Monroe's losses was "somewhere in the middle" of the versions presented in the presentence report.

On the basis of these statements, to which Duncan did not object, the district court could have concluded that Duncan's dispute regarding the forged government checks concerned the *amount* which he took for his own use, not whether any loss occurred at all. *See United States v. Kirkland*, 853 F.2d 1243, 1250 (5th Cir.1988)

(holding conduct at sentencing hearing binding as stipulation).

The district court's order, in response to Duncan's claim that he was innocent of defrauding Monroe of "a large portion" of the amount of the government checks, deferred the determination of the amount of any restitution to be paid to the resolution of a civil suit pending between Monroe and Duncan. This satisfies the requirement of *Watchman* that the specific monetary losses be established by reference to more than the generalities and potentially unreliable evidence contained in the presentence report. *See Watchman*, 749 F.2d at 619.

*Watchman* specifically contemplated the possibility that a separate hearing may be necessary to determine the amount of restitution:

> In order to prevent variations in the methods for application of the Act as to restitution orders, the trial courts should place the burden on the prosecution and on the defense to develop the facts before the sentencing hearing. This will help accomplish the purpose of the Act to protect the victim and to prevent mistakes as to the defendant. *If a hearing as part of sentencing is advisable to further resolve the dispute as to the amount, it should be held.*

*Id.* (emphasis added). The civil suit in this case presumably places upon Monroe, the plaintiff, the burden of establishing Duncan's responsibility for the loss and the amount of that loss by a preponderance of the evidence, thus satisfying the requirement of 18 U.S.C. § 3664(d).

■ When the civil suit covers the same alleged acts of wrongdoing as the restitution order, as it does in this case, and when the amount of compensatory damages sought in connection with those acts is no greater than the amount alleged by the Government in connection with the offense, we find no abuse of discretion in the district court's deferral to the judgment in the civil suit. When the precise amount owed is difficult to determine, Congress authorized the courts to "reach an *expeditious, reasonable* determination of appropriate restitution." S.Rep. No. 532, 97th Cong., 2d Sess. 31, *reprinted in* 1982 U.S.Code

Cong. & Admin.News 2515, 2537 (emphasis added); *see Kirkland*, 853 F.2d at 1250 n. 13. Duncan's counsel specifically suggested to the district court that the civil suit would be the appropriate forum for determining any liability for Duncan's alleged forgery. Duncan has failed to allege any prejudice from the district court's order, and we find none.

The district court's order of restitution is therefore AFFIRMED.